(COMMON LAW.)

## BLIGHT'S Lessee *et al* v. ROCHESTER.

British subjects, born before the revolution, are equally incapable with those born after, of inheriting, or transmitting the inheritance of lands in this country.

The treaties of 1783, and 1794, only provide for titles existing at the time those treaties were made. and not to titles subsequently acquired.

Actual possession is not necessary to give the party the benefit of the treaty; but the existence of title at the time is necessary.

Where *J. D.*, an alien and British subject, came into the United States subsequent to the treaty of 1783, and before the signature of the treaty of 1794, died, seized of the lands in question : *Held*, that the title of his heirs was not protected by the treaties.

In what cases citizenship may be presumed so as to confirm a title to lands.

The doctrine of estoppel, or the principle of legal policy, which forbids a party from denying the title under which he has received a conveyance, does not apply as between vendor and vendee, especially where the latter has not received possession from the former.

ERROR to the Circuit Court of Kentucky.

This was an ejectment in the Court below, brought to recover the possession of lot No. 18, in the town of

Danville, in the State of Kentucky. It appeared, from the evidence in the cause, that the plaintiffs are the heirs of John Dunlap, who was a citizen of Pennsylvania, and claimed as the heir of his brother, James Dunlap, who died seised of the premises in question, in the autumn of 1794. James Dunlap was an alien, and a subject of the king of Great Britain, who came to the United States subsequent to the treaty of peace of 1783, and died before the signature of the treaty of 1794. After his death, one Hunter, professing to have purchased of John Dunlap, entered into possession, and conveyed to several persons, parcels of the lot; and to the defendant, Rochester, one parcel, in 1795, who entered into possession thereof, and has occupied the same ever since; having acknowledged the title of said Dunlap, as that under which he held.

Upon this evidence, the counsel for the plaintiffs moved the Court to instruct the jury,

1st. That if the jury find the defendant obtained possession under James G. Hunter, who obtained possession as the attorney of *John* Dunlap, or who claimed under an executory agreement with John Dunlap, and that said defendant has held, and occupied under John Dunlap's title, claiming from said Hunter, as the attorney of said Dunlap, or under an executory agreement, or has, since he was in possession, acknowledged the title of said Dunlap, as that under which he held; that then the defendant is not permitted to impeach or controvert the title of said *John* Dunlap, by parol evidence that *James* Dunlap was an alien.

2d. That if the defendant, Rochester, acquired the possession, and has continued to hold as above, the possession of the defendant was not such an adverse possession as would toll the right of entry of said *John* Dunlap, and the statute of limitations does not apply.

3d. That if James Dunlap occupied the lot, from the date of his deed till his death, and said James G. Hunter and the defendant have continued to hold it under the claim of John Dunlap, his brother, as heir to James; that from these facts, connected with the evidence in the cause, and in the absence of any proof of an inquisition or office found as to the alienage of James Dunlap, and in the absence of any grant or other act of the commonwealth or its officers since the death of said James, in derogation of the title of said *James* or of said *John*, they should presume that said *James* was a citizen of the United States.

4th. That if they believe the evidence, they should find for the plaintiff.

5th. That the jury have a right to presume that James Dunlap was a citizen of the State of Virginia, or of some one of the United States, and if so, John Dunlap was his heir, and capable of inheriting.

6th. That if James Hunter entered under a parol agreement with John Dunlap, the possession of said Hunter was the possession of said Dunlap

7th. That the inheritance claimed by *John* Dunlap, as heir to James, is protected by, and within the provisions of the treaty between the United States and Great Britain, signed 19th November, 1794.

The Court refused the 1st, 3d, 4th, 5th, 6th, and

7th instructions, moved by the plaintiff; and gave the second, with this qualification, " that if *John* Dunlap had either title or the actual possession of the premises after the death of *James* Dunlap, and before the entry of said Hunter, or of the defendant, then the statute of limitations did not apply."

The defendant moved the instruction, that if James Dunlap was an alien, and died before the 19th November, 1794, then the plaintiff has made out no title to the land in question which will authorize them to find for him ; which was given by the Court with this qualification, that if the jury find that *John* Dunlap had actual possession of the premises after the death of *James* Dunlap, and prior to the time when Hunter took possession, in that event this instruction would not be given.

*March* 15*th.*    Mr. *Bibb*, for the plaintiff, (1.) stated that the first instruction, moved on the part of the plaintiffs, involved the proposition that Hunter, who entered, claiming under John Dunlap, would be estopped from denying John Dunlap's title by parol, and that the defendant, Rochester, who entered under Hunter, stands in the same predicament with his grantor, and is besides precluded by his own acknowledgment from denying the title from which his own is derived.[a]

a Jackson v. Stewart, 6 *Johns. Rep.* 34. Jackson v. Reynolds, 1 *Caines' Rep.* 444. Jackson v. Whitford, 2 *Caines' Rep.* 215. Brandt v. Livermore, 10 *Johns. Rep.* 358. Jackson v. Hinman, *Ib.* 292. Jackson v. Bush, *Ib.* 223. Jackson v. M'Leod, 12 *Johns. Rep.* 182. Jackson v. Graham, 3 *Caines' Rep* 188. Phillips v. Rothwell, 4 *Bibb's Rep.* 33. Connelly v. Chiles, 2 *Marsh. Kent. Rep.* 242

2. The second instruction asked by the plaintiff was given by the judge below, but with a qualification. That qualification involves the questions discussed on the first instruction, by permitting the defendant to impeach the title of John Dunlap, or by requiring an actual entry by John, after the death of James, and before Hunter or the defendant entered. It is insisted that the *pedis possessio* of John was not necessary ; that the entry of Hunter, claiming under him, enured to his benefit, and was sufficient to enable Hunter, and all claiming or holding under him, after such entry, to show title derived from John Dunlap.[a]

3. The third and fifth instructions prayed for, may be considered together. In withholding both these instructions, the Court has denied to the jury the right to infer one fact from another. From the long uninterrupted possession held under the title of the Dunlaps, and as against the defendant, who had acknowledged John Dunlap's title, the jury ought to have been permitted to fill, by intendment or presumption, after the death of both the Dunlaps, the only chasm alleged by the defendant to exist in that title. Before the establishment of a uniform rule of naturalization under the new constitution, the laws of the different States gave great encouragement to emigration, by conferring the privileges of citizenship on easy terms. The acknowledgment of John Dunlap's title by the defendant, his possession under it, and demand of a deed from John D., was sufficient

a Barr v. Gratz, 4 *Wheat. Rep.* 214. Jackson v. Reynolds, 1 *Caines' Rep.* 444. Jackson v. M'Leod, 12 *Johns. Rep.* 182.

1822.

Blight's Lessee
v.
Rochester

1822.

Bligh's Lessee

v.

Rochester.

evidence, of itself, to warrant the jury to find John D. a citizen, if that were necessary to perfect his title. *Omne majus continet in se minus :* the acknowledgment of his title involved the admission of the fact that he was a citizen.[a]

4. The fourth instruction may be considered as involving the previous instructions moved ; for, if the defendant was stopped to deny John D.'s title, and the statute of limitations did apply to the case, then certainly the plaintiffs were entitled to recover. As to the statute of limitations, as the defendant claimed under John D., and looked to him for the perfection of his title, the possession of the defendant is not such an adverse possession as would toll the right of entry of the heirs of the said John D.[b] To bar the plaintiff in ejectment, the possession of the defendant must have been adverse in its commencement, and so continued.[c] The defendant admitted John D.'s title within twenty years before action brought, and the plaintiffs were residing out of the State of Kentucky, and consequently within the savings of the statute.

5. The sixth instruction asked is grounded upon the local statute of frauds and perjuries, which is similar to the English statute of frauds, 29 Car. II. c. 3, and avoids " any contract for the sale of lands, &c. unless the agreement, or some note, or memo-

a *Co. Litt.* 52. b. *Noy. Max.* 16—17.

b *Litt. s.* 396, 397.  *Co. Litt.* 242.  *Bull. N. P.* 102.

c 1 *Johns. Rep.* 158.  3 *Johns Rep.* 223.  2 *Johns. Rep.* 22. 4 *Johns. Rep.* 230.  9 *Johns. Rep.* 167.  10 *Johns. Rep,* 435. 12 *Johns. Rep.* 368.  1 *Marsh. Kent. Rep.* 62.  2 *Bibb,* 506.

randum thereof, shall be in writing, and signed by the party," &c.· Hunter having entered, claiming under John D., and showing no agreement between them, the statute applies to avoid any parol agreement ; Hunter was, upon his entry, the tenant at will of Dunlap, and the defendant, coming in under Hunter, is in the same predicament.

7. The treaty of 1794, between the United States and Great Britain, is to be construed liberally, according to its spirit, and the good faith which ought to be observed between sovereigns. The words, " now hold," as used in the 9th article, do not mean an actual possession.[a] These expressions exclude titles acquired after the signature of the treaty, but embrace all titles before the treaty, not confiscated or annulled by legislative acts before the signature of the treaty. The latter clause of this article declares, that " neither they, nor their heirs and assigns, shall be regarded as aliens." As to all the cases provided for by that article, the inheritance is provided for without regard to the common law requisition of mutual or common allegiance between ancestor and heir ; and the capacity to make title as heir is placed entirely upon the fact of private relationship between American citizens or British subjects, independent of their political relationship to the one or the other of the two governments. The treaty of 1783 had provided against future confiscations. Taking that and the treaty of 1794 together, as made in *pari materia*, the

1822.

Blight's Lessee
v.
Rochester

a Harden v. Fisher, 1 *Wheat. Rep.* 300. Orr v. Hodgson, 4 *Wheat. Rep.* 463.

words " now hold" ought not to be confined to cases of actual occupation by British subjects or American citizens, nor to the exclusion of such as would be heirs but for alienage, but would apply to all those claims which were not actually seized upon, or confiscated by the respective governments of the United States or Great Britain; and which would, but for the treaty, be liable to be affected by the common law doctrines in relation to inheritance. If such be the true construction, John D. might inherit the property of James D. under the treaty of 1794, if James were an alien; because no act of the government has confiscated, escheated, or re-granted the premises.

As to the instructions asked on the part of the defendant, they are substantially involved in those which have already been discussed.

Mr. *B. Hardin,* contra, argued, (1.) That the defendant, Rochester, was not estopped from disputing the title of the plaintiffs. If the doctrine as applicable between lessor and lessee be insisted on, the answer is, that the defendant, if a tenant, is a tenant at will, with a parol permission to enter. This cannot estop, for no man is estopped by parol from alleging the truth. There must then be a deed to estop. An estoppel consists only of an instrument superior in dignity to the evidence offered. Suppose the fact to be, that John D. sold to Hunter, and that Hunter conveyed to Rochester, and it turns out that D. had no title, can he recover? If a lease be made by deed poll, and the lessor have nothing in the premises, the

lessee is not estopped.[a]  It is on principles of legal policy or moral honesty, and not of estoppel, that a lessee is not permitted to deny the estate of his lessor.  The Court has some discretion in limiting the rule, because, being adopted to promote the purposes of justice, it is not inflexible.  It applies only to a person who enters as tenant, and never to one who enters and claims in his own right.  It cannot apply as between vendor and vendee, and certainly not where the latter never received possession from the former.

2.  As to the treaties of 1783, and 1794, it is the settled doctrine of this Court, that they were meant to provide only for titles legally existing at the time the treaties were signed, and not to titles subsequently acquired.  It is true that it is not necessary that the parties should have an actual possession of seisin ; but it is necessary that the title should be legally vested in them at the time the treaty was made.[b]

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

The exceptions taken to the opinion of the Circuit Court in this case, may be divided into two parts :

1st. Those which respect the actual title of the plaintiffs.

2d. Those which respect the ability of the defendant to contest that title.

1st. The title of the plaintiffs.

a Co. Litt. 47. b.  Roll. Abr. 871.
b Harden v. Fisher, 1 Wheat. Rep. 310.

1822.

Blight's Lessee
v.
Rochester.

March 20th

1822.

Blight's Lee-
see
v.
Rochester.

, Construction
of the British
treaties of 1783
and 1794, as to
titles to land.

They are the heirs of John Dunlap, who was a citizen of Pennsylvania, and claimed as the heir of James Dunlap, who died seised of the premises in the declaration mentioned, in the autumn of 1794. The defendants allege and prove that James Dunlap was an alien, and subject to the King of Great Britain, who came into the United States subsequent to the treaty of peace, and who died before the signature of the treaty of 1794, and whose title, therefore, is not protected by either of those treaties.

The Court having left the fact to the jury, their verdict has found that James Dunlap died previous to the signature of the treaty of 1794, and the question is, whether the Court erred in determining that this case was not either within the treaty of peace, or the treaty of 1794.

It has been decided that British subjects, though born before the revolution, are equally incapable with those born subsequent to that event, of inheriting or transmitting the inheritance of lands in this country. Consequently, the sole inquiry in this case respects the effect of the treaties between the United States and Great Britain.

The treaty of peace has always been considered as providing only for titles existing at the time ; and as the title of James Dunlap was afterwards acquired, it can derive no aid from that treaty.

James Dunlap, therefore, if he continued to be an alien, continued liable to all the disabilities of alienage, one of which is an incapacity to transmit lands to heirs. Consequently, when he died, the next of kin could take nothing by descent. The treaty of 1794,

like that of 1783, provides only for existing rights. It does not give title. Had James conveyed, or devised the property to John, the title would have vested in him, subject to the right of the government to seize the land ; and the treaty would have confirmed that title, so if the law would have vested the estate in him by descent. But as the fact is. he had no title, nothing on which the treaty could operate. It has been said that this Court has never supposed actual possession to be necessary to entitle a party to the benefit of the treaty. This is true. But the existence of title, at the time, has always been supposed necessary.

The plaintiffs also insisted that under the circumstances of this case, the jury might presume James Dunlap was a citizen.

The circumstances are the length of time which has intervened since his arrival in this country, and since his first acquisition of real estate, during which there have been no proceedings instituted under the laws of escheat and forfeiture.

The weight which might be allowed to this argument, had the property continued in the peaceable occupation of the heirs of James Dunlap, and had this presumption been required to sustain the title clothed with that possession, is, we think, diminished by the circumstance that the land was, soon after his death, claimed and occupied by a citizen of Kentucky as a purchaser. In such a state of things it is not surprising that no inquiries should be made into his citizenship, and that no person should feel disposed to intermeddle with the affair.

The alienage of James Dunlap being fully proved, and the laws of Virginia requiring, as indispensable to his citizenship, that he should take the oath of fidelity to the commonwealth, in a Court of record, of which the Clerk is directed to grant a certificate, we do not think that this fact, which, had it taken place, must appear on record, ought to be presumed, unless there were some other fact, such as holding an office of which citizens alone were capable, or which required an oath of fidelity, from which it might be inferred.

In favour of long possession, in favour of strong apparent equity, much may be presumed; but in a case where the presumption would defeat possession, where the equity is doubtful, where the parties rely upon strict law, Courts will be cautious how they lean in favour of presuming that which does not appear, and which might be shown by a record.

The Circuit Court has declined giving the instruction which was required; but, on this point, has given no counter instruction, and has assigned no reason for refusing that which was required. It may have been, that the presumption in favour of a deed from John Dunlap so entirely balances the presumption in favour of the citizenship of James, as to prevent the allowance of either.

If James Dunlap could not be considered as a citizen at the time of his death, the plaintiffs have no title; and the only remaining question arising on the bill of exceptions, is. was the defendant restrained

on the principle of estoppel. or any other principle, from resisting their claim.

It is contended that he is so restrained, because John Dunlap sold to Hunter, and Hunter has conveyed to the present defendant.

It is very certain, that these sales do not create a legal estoppel. The defendant has executed no deed to prevent him from averring and proving the truth of the case. If he is bound in law to admit a title which has no existence in reality, it is not on the doctrine of estoppel that he is bound. It is because, by receiving a conveyance of a title which is deduced from Dunlap, the moral policy of the law will not permit him to contest that title.

This principle originates in the relation between lessor and lessee, and so far as respects them is well established, and ought to be maintained. The title of the lessee is, in fact, the title of the lessor. He comes in by virtue of it, holds by virtue of it, and rests upon it to maintain and justify his possession. He professes to have no independent right in himself, and it is a part of the very essence of the contract under which he claims that the paramount ownership of the lessor shall be acknowledged during the continuance of the lease, and that possession shall be surrendered at its expiration. He cannot be allowed to controvert the title of the lessor, without disparaging his own, and he cannot set up the title of another, without violating that contract by which he obtained and holds possession; and breaking that faith which he has pledged, and the obligation of which is still continuing, and in full operation.

1822.

Blight's Lessee
v.
Rochester.

Doctrine of estoppel, or any other analogous principle, inapplicable to the present case.

In considering this subject, we ought to recollect, too, the policy of the times in which this doctrine originated. It may be traced back to the feudal tenures, when the connexion between landlord and tenant, was much more intimate than it is at present: When the latter was bound to the former by ties not much less strict, nor not much less sacred, than those of allegiance itself.

The propriety of applying the doctrines between lessor and lessee to a vendor and vendee, may well be doubted.

The vendee acquires the property for himself, and his faith is not pledged to maintain the title of the vendor. The rights of the vendor are intended to be extinguished by the sale, and he has no continuing interest in the maintenance of his title, unless he should be called upon in consequence of some covenant or warranty in his deed. The property having become, by the sale, the property of the vendee, he has a right to fortify that title by the purchase of any other which may protect him in the quiet enjoyment of the premises. No principle of morality restrains him from doing this; nor is either the letter or spirit of the contract violated by it. The only controversy which ought to arise between him and the vendor, respects the payment of the purchase money. How far he may be bound to this by law, or by the obligations of good faith, is a question depending on all the circumstances of the case, and, in deciding it, all those circumstances are examinable.

If the vendor has actually made a conveyance, his title is extinguished in law as well as equity, and it

will not be pretended that he can maintain an eject-ment. If he has sold, but has not conveyed, the con-tract of sale binds him to convey, unless it be condi-tional. If, after such a contract, he brings an eject-ment for the land, he violates his own contract, un-less the condition be broken by the vendee; and if it be, the vendor ought to show it.

In this case a sale by John Dunlap to Hunter is stated, and a conveyance from Hunter to Rochester, the defendant, is also stated, but that conveyance does not appear in the record. Whether it contains any reference to the title of Dunlap, or not, is not shown. The defendant then holds in his own right by a deed of conveyance which purports to pass the legal title. The plaintiffs show no title in them-selves, but allege and prove that the title under which the defendant claims is derived from their ancestor. They therefore insist that the defendant is bound in good faith to admit this title, and surrender the pre-mises to them.

But the sole principle on which this claim is found-ed is, that the defendant must trace his title up to their ancestor, and is bound therefore to admit it. But if the deed of the defendant does not refer to their ancestor, and the record does not convey this information, the defendant holds in opposition to the title of John Dunlap, or claims to have acquired that title. If he holds under an adversary title his right to contest that of Dunlap is admitted. If he claims under a sale from Dunlap, and Dunlap himself is compelled to aver that he does, then the plaintiffs themselves assert a title against this contract. Un-

less they show that it was conditional, and that the condition is broken, they cannot, in the very act of disregarding it themselves, insist that it binds the defendant in good faith to acknowledge a title which has no real existence.

Upon reason, then, we should think that the defendant in this case, under all its circumstances, is at liberty to controvert the title of the plaintiffs.

But it is contended that this question is settled in Kentucky by authority. There are also several cases quoted from the decisions in New-York, which we have not had an opportunity of examining fully. Those we have considered are, we think, distinguishable from this in some of their circumstances, especially in this material one, that the vendor gave possession to the vendee. But the decisions of one State, though highly to be respected, are not authority in another, especially with respect to land titles. In *Phillips* v. *Rothwell*, in 4 *Bibb*, 33. the defendant claimed under a conveyance from the tenant of the plaintiff. That case, therefore, was decided on the doctrine applicable to lessor or lessee.

The case in 2 *Marshall*, 242. was the case of a purchaser who had not received a conveyance, and who was not allowed to set up an outstanding title in a third person. The report gives us only the opinion of the Court, not accompanied by a statement of the case, or the points made at the bar. We therefore cannot tell whether, in asserting his title, the vendor acted in opposition to his contract. We cannot say that the condition on which the sale might depend had not been broken. There is, too, a difference between set-

ting up an adverse title in a third person, to contro-
vert an actual existing title, and resisting a claim
made by a person having no title whatever. In the
case last mentioned it would appear that the plaintiff
had a title which was in itself sufficient to maintain
his action ; but there was another, and perhaps a su-
perior title, in a third person, with which the de-
fendant was not connected. The rejection of all
evidence of this title does not, we think, prove that
the same Court would have compelled the defendant
to acknowledge a title of which no evidence was
given, or have rejected proof of any title in himself ;
especially when the vendee received nothing—not
even possession from the vendor.

Judgment affirmed with costs.