TOWBIN v. UNITED STATES.
No. 1543.

Circuit Court of Appeals, Tenth Circuit.
Jan. 6, 1938.

Ralph L. Carr and William O. Perry, both of Denver, Colo., for appellant.

C. V. Marmaduke, Jr., Asst. U. S. Atty., of Denver, Colo. (Thomas J. Morrissey, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Appellant, Samuel Towbin, a practicing physician in Denver, convicted in the United States District Court for the District of Colorado under three counts of an indictment charging violations of section 1044(a), 26 U.S.C.A., and three counts of the same indictment charging violation of section 1693(a) (A), 26 U.S.C.A., appeals to this court for review of the judgment of said court imposing upon him a sentence of three years under each of said counts, to run concurrently, in addition to a fine of $500 under each of the first three counts.

Count 1 charged that on or about the 8th day of January, 1936, Dr. Towbin did unlawfully, knowingly, and feloniously sell, barter, exchange, give away, dispense, and distribute, to a person or persons to the grand jurors unknown, 10 grains of morphine not in pursuance of a written order of the said person or persons on a form issued in blank for that purpose by the Commissioner of Internal Revenue.

Counts 2, 3, 4, 5, and 6 are in all material respects the same as count 1 except as to amount and date.

Counts 7 to 12, inclusive, are based upon title 26 U.S.C.A. § 1044(c) (1), charging that appellant unlawfully, willfully, knowingly, feloniously, falsely, and fraudulently did simulate, execute, and sign the record required by the revenue laws showing the amount dispensed and distributed and the name and address of the patient to whom such drugs were distributed, and that the said record was falsely made, simulated, and executed by Dr. Towbin, and that the party therein named in truth and fact received no such medicine containing morphine on the date mentioned therein. The record as made by appellant as charged in the seventh count is as follows: "Jan. 8, 1936, G. Hagen, 739 Fox, 12 Pain No. 1,

Flu." "Jan. 8, 1936, G. Hagen, 739 Fox, 4 Ozs. Cough No. 1, Flu."

It is not essential to set out the record alleged to have been simulated by appellant in counts 8, 9, and 10, as two of said counts were dismissed and an acquittal resulted on the other. Conviction was had on counts 1, 5, 6, 7, 11, and 12.

At the close of the case, counsel for appellant moved for a directed verdict on the ground that there was not sufficient evidence on any count to take the case to the jury. Said motion was denied and exceptions separately saved and the ruling thereon is assigned as error.

John W. Marsh, a United States narcotic agent, testified on January 13, 1936 that he went to appellant's office and after making an inspection of the records of narcotics purchased and their disposition, carried away said records and held them until the trial of the case. He stated that appellant explained that entries in his record marked "Pain No. 1" referred to capsules containing a half grain of morphine sulphate, a half grain of phenobarbital, a grain of amidopyrine and three grains of acetylsalicylic acid, and that the term "Cough No. 1" was a sulphate containing one grain of morphine sulphate, a half dram of paregoric, and an ounce of syrup of white pine.

Mrs. Frances Hagen, a former patient to whom he had given medicine prior to the date of the alleged violation, having made an engagement over the phone to see him at a named time, came to his office to pay a bill, at which time he gave her no medicine. This was on January 8, 1936. When federal men later came to her house, she again called appellant by telephone, asking if she might see him. That evening she came again to his office to learn if the federal men were after the bill which she had owed and paid, appellant not having communicated relative thereto with her subsequent to her paying said bill. Appellant told her that the men were trying to find out if he had given her any medicine in January, and agreed with the witness that he had given her no medicine at such time, but suggested that he had probably made a record to that effect in his books, his books not then being available to him, the federal agent having taken his records and not returned them. His recollection was that he had given the medicine to another person, and upon the trial it was proved that such party was a Mrs. Whalen, who took the stand and testified that she did, in fact, receive such medicine at about that time. No record of Mrs. Hagen's receipt of the medicine appeared in Exhibit A, which was the record seized and taken away by the narcotic agent.

After she had been before the grand jury in September, Mrs. Hagen said that appellant called her over the phone and asked her if she would talk to his lawyer and if she had made any affidavit or given testimony against him before the grand jury. She refused to give him any information because what had happened before the grand jury was to be kept secret. On redirect examination, after refreshing her memory by the examination of an instrument marked Exhibit B, not offered in evidence, but evidently a memorandum prepared by the government agents, which she had signed, the witness said that appellant asked her if she would help him by saying that he had, in fact, given her medicine. Appellant, relative thereto, testified that he asked Mrs. Hagen if she would tell his lawyer if he had ever given her any medicine.

Mrs. M. Whalen came in about the time Mrs. Hagen arrived according to her appointment. Appellant excused himself, going into another room, where he received from Mrs. Hagen payment of her account, giving her a receipt therefor. He testified that after Mrs. Hagen left he administered to Mrs. Whalen four ounces of the cough remedy known as Cough No. 1 and 12 capsules known as Pain No. 1. Said record showed medicine given to Mrs. Hagen on January 8, 1936, which he testified should have been noted as given to Mrs. Whalen, the dates apparently being the same.

Mrs. M. Whalen testified that appellant had been her physician for two years, and that, whilst suffering from the flu about a week after New Year in 1936, she went to his office and received from him some cough syrup and capsules. She did not remember how many capsules.

In the record book, Exhibit A, no medicine was recorded as given to Mrs. Whalen at any time near the date in question. Appellant testified that Mrs. Hagen telephoned to him that federal narcotic agents had been to see her and asked for an explanation relative thereto, and then it occurred to him that he might have made an entry giving her name in his book and he told her

he must have made the mistake in entering her name. She said he stated that he had given the medicine to another man, but his recollection was that he said he had given it to another person.

As to the conversation in September, 1936, after the meeting of the grand jury, appellant testified that Mrs. Hagen had again called him to say that she had moved from 739 Fox street to Vrain street and had given him her telephone number, and that later he called at her home to ask if his attorney might come to see her and if she would tell his lawyer if he had, in fact, given her medicine, and she agreed that she would tell the truth about the matter to his attorney.

The other four counts under which he was convicted involved appellant's treatment of Mrs. Caral Smith of 1038 Milwaukee street, Denver, for an injury caused by a large wooden sliver which had pierced her hip. When she went to his office in great pain on New Year's Day, 1936, appellant found it necessary, as he could not pull it out, to make an incision the length of the sliver, which occasioned the injection of novocaine, a local anesthetic, to deaden the pain.

The question involved in counts 5 and 11 concerns the exact date of the receipt of medicine by Mrs. Smith. Appellant's record shows that he dispensed it on the occasion of her first visit on January 1, 1936, when he realized after the removal of the sliver that the effects of the novocaine would soon wear off and the pain which had brought her to his office would return. Novocaine loses its effect after a period of from 30 minutes to 2 hours. Mrs. Smith thought that the first medicine she received was given to her on her second visit on January 3, when she was having more pain than on the occasion of her first visit. Appellant testified that on the second visit he removed the scab, cleaned the wound, applied an antiseptic ointment, put on a grease dressing, and told her to go home and apply wet heat. He had no recollection and his record did not show that he gave the witness any medicine on this occasion. His record and his recollection are in accord. The event of Mrs. Smith's third visit to the office of Dr. Towbin in January, 1936, is important. Although he was charged and convicted of criminal misconduct under the sixth and twelfth counts of the indictment, the testimony of the government harmonizes with that of the defendant in establishing that he was guilty of nothing. Mrs. Smith's story is identical with that of appellant, except as to the shape and number of the capsules received, and the record, Exhibit A, corroborates the physician.

Mrs. Smith testified that she went to appellant's office the third time on January 4, 1936, because of the continued severe pain in her hip, and that he gave her pills which furnished the needed relief. She said that the pills were shaped like aspirin tablets and that each relieved her pain for about 2 hours, although she took six in one day, they did not hurt her. The appellant testified that she returned the third time on January 4, 1936, in great pain, and that he again gave her morphine capsules. His record, which was in the possession of the prosecution, corroborates him both as to the facts and the date of the delivery of the medicine, the book entry showing that it was in capsule form.

Except for further examination of Narcotic Agent Marsh, this testimony of these two women constitutes the entire evidence upon which the government rested its right to a conviction. This further testimony by Marsh, with the questions, remarks, and colloquies accompanying, furnishes the only reasonable explanation for the conviction which was returned.

The district attorney established that the doctor's office was under observation by the government agent at a certain time, and then suggested in several questions which followed that two men who had pleaded guilty in the same court a few days before, and who were drug addicts, had visited appellant's office on several occasions. Objections to the questions were sustained and the jury ordered to disregard them.

No evidence was received on four of the counts in the indictment, but the evidence concerning two others on which verdicts of acquittal were returned may be enlightening. The government charged that an entry in the physician's narcotic record book stating, "December 25, 1935, A. Tinsley, Golden, 12 Pain No. 1, Injured Foot," was equally false, fraudulent, and felonious, and called one James A. Tinsley, a resident of Golden, who testified that he had never seen appellant before, nor had he ever consulted with, or been treated by, Dr. Towbin for an injured foot.

For the defendant, Maj. William F. Hunn, superintendent of PWA projects on state property, and supervisor for 22 months of a transient camp maintained by the government around the Rifle Range, near Golden, in Jefferson county, Colo., testified that appellant had been the contract doctor for the camp during about 2 years, and during this period a client named Tinsley lived in the camp.

Malcom Pitman, of 1651 California street, Denver, testified that he was at the transient camp near Golden for 2 years, and that he worked in the infirmary as an assistant to appellant and knew that appellant attended a man named Tinsley for a period of about a year from April, 1935, to May, 1936, and that, during this period, Tinsley drove the sharp point of a pick into his foot just above his ankle. The witness gave Tinsley aspirin tablets to ease his pain, washed the wound with an antiseptic, and sent for Dr. Towbin, and, upon the latter's arrival, appellant removed the bandages, swabbed and scraped the wound, told Pitman that the aspirin tablets would do no good, and gave him capsules to ease the injured man's pain. Pitman and other attendants administered these capsules to Tinsley. Pitman testified further that the name of the camp client was Vernon Tinsley and that witness became well acquainted with him as the two went out together frequently. Said Tinsley left in May, 1936, to go to a construction job somewhere in Nebraska.

Appellant testified that he received his earlier university training at Denver University and was graduated from the medical school of the University of Colorado, after which he served an internship at St. Luke's Hospital, Denver, and that he had practiced since 1930 a year and a half at Antonito and the remainder of the time in Denver.

Dr. Walter W. King, a physician and surgeon in Colorado since 1902, and a recent past president of the Colorado State Medical Society, testified that he had known appellant since babyhood and that he was acquainted with appellant's conduct as a practicing physician, and that his reputation in Denver as being an ethical practitioner was good.

Dr. R. W. Ardt, a physician for 36 years in Colorado, testified that appellant had been one of his students in the medical

school of the University of Colorado, and that he had known him for about 10 years, and testified that appellant's reputation in the community as an ethical practitioner was good.

Dr. Philip W. Whiteley, a practicing physician and surgeon in Denver since 1921, had known appellant as a clerk in a drugstore before and since he was graduated from medical school and testified that his reputation as an ethical practitioner was good.

The evidence upon which the conviction is based deals with only three transactions. Two counts are based upon each transaction, involving an accident of Mrs. Caral Smith and the efforts of her physician to remedy the injury and to relieve her suffering, and dealing with a delivery of drugs to one patient in good faith, and the inadvertent recording of that delivery as having been made to another.

As to the Mrs. Smith transactions, she agreed with the physician's contention in every detail except that she could not give the name of the drug which she knew was injected in one instance. Up to this point their stories are in utter accord. She testified she received no medicine from him on one occasion, giving as a reason for so believing she was having no pain at that time, but she states she got it at another time, the dates being 2 or 3 days apart.

Whether it was the first and fourth or the third and fourth days of January when the drugs were delivered seems not to be so essential, for here was a bona fide patient with an injury involving intense suffering and the delivery of drugs to relieve the pain, with the government and the defense in agreement on every material factor. Then simply because a woman's unsupported memory disagrees with the recollection of the doctor as to the date he served her in her distress, with the physician's version being corroborated by his written record, this man should not be made to enter a felon's cell.

The real question involves the proposition as to whether drugs were administered in good faith under conditions which the statute recognizes and for which it makes provision.

The fact that he made the record as to the date of the first dispensing, when the woman's pain was first relieved, indi-

cates absence of any unlawful design. This condition defeats the charges under the eleventh and twelfth counts of the indictment that he falsely, unlawfully, and knowingly simulated a record. The fact that the woman received the drugs when she went to his office for treatment for her injury renders it impossible for a conviction to stand under the Harrison Narcotic Act § 2, 26 U.S.C.A. § 1044(a), requiring a written order. The government proved a dispensing of drugs by a physician in the practice of his profession. This does not alone constitute a crime, and a jury's verdict based on such evidence does not make it such.

 The transaction involving Mrs. Hagen shows that the doctor's record does not truly reflect what happened. In that case, however there was a bona fide illness on the part of Mrs. Whalen, a flesh and blood patient, and a delivery of drugs in conformity with the law's requirements when dispensed in the practice of the medical profession. With the sick patient already in his office, appellant excused himself to keep an appointment in another room with a former patient who was there to pay a bill. Thereafter, when he was brought into court it was found that his record shows that the drugs, which were actually delivered to the sick woman, Mrs. Whalen, were noted as furnished to the former patient, Mrs. Hagen, who had been in the office at the same time, but who had only paid a bill. The record book was taken from his office less than a week later by narcotic agents, no opportunity being afforded the physician, prior to the trial, either to discover the error or to explain it.

There was an actual illness—a case of flu on the part of Mrs. Whalen—a treatment for her ailment and a delivery of drugs, as the law permits. Had there been no injury and no illness, and no patient, and the government had been in some manner cheated, there might be cause for complaint, but when there was a sick person in every instance who needed and who actually received medicine, no criminal misconduct is established. When there is a record of drugs dispensed resulting in the alleviation of suffering, then we go far afield in an attempt to enforce the law by blasting the future of a professional man on such evidence. Because there is no substantial evidence of a violation the court should have directed a verdict of acquittal.

Some evidence has been presented but it is not substantial. The law requires more than merely "some evidence"; it demands that the verdict be based on substantial evidence or a conviction will not be permitted to stand. In this case all the substantial evidence is as consistent with innocence as with guilt.

In Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 232, 233, 74 L.Ed. 720, it is said: "A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' "

The same doctrine is announced in Leslie v. United States, 10 Cir., 43 F.2d 288, 290, as follows: "The government must establish guilt. The court must direct a verdict if no substantial proof of guilt is offered. When the proof rests on circumstances which lead as rationally to the conclusion of innocence as of guilt, there is no proof of guilt, and nothing to go to the jury. Juries are not permitted in civil cases to speculate as to the negligence of the defendant (Atchison, T. & S. Ry. Co. v. Toops, 281 U.S. 351, 355, 50 S.Ct. 281, 74 L.Ed. 896, and cases there cited); they should not be permitted to guess at the guilt of a defendant in a criminal case."

In Bishop v. United States, 8 Cir., 16 F.2d 410, 416, it is said: "This court has often taken the position that, where the evidence in a case is as consistent with innocence as with guilt, a conviction cannot be sustained. In Grantello v. United States, 3 F.2d 117, 118, this court said: 'Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction.' Willsman et al. v. United States (C.C.A.) 286 F. 852; Sullivan v. United States (C.C. A.) 283 F. 865; Edwards v. United States (C.C.A.) 7 F.2d 357."

See, also, Moore v. United States, 10 Cir., 56 F.2d 794, and Linder v. United

States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819, 39 A.L.R. 229.

With respect to counts 1, 5, and 6, which charge unlawful sale of morphine to persons unknown to the grand jury, no evidence was offered to show that any sale of morphine on the dates in question was made to anyone. The government seems to rely upon the fact that making of false records in counts 7, 11, and 12 would raise a presumption that the morphine falsely recorded therein was sold by appellant to some one else. That is not such substantial evidence as to take the issue to the jury. Appellant could still have the morphine, or have been not unlawfully administered in the practice of his profession. The burden rests upon the government to establish by substantial evidence the guilt of the defendant, or the court must direct a verdict.

As to counts 7, 11, and 12, if appellant actually dispensed such drugs to the parties named therein, that alone would not constitute violation of the Harrison Narcotic Act, 26 U.S.C.A. §§ 1040–1054, 1383–1391, for the reason that such would come within the exception that a physician may dispense in the course of his professional practice.

This is not such substantial evidence as to exclude every reasonable hypothesis but that of guilt. Moore v. United States, supra; Patterson v. United States, 10 Cir., 62 F.2d 968; Grantello v. United States, 8 Cir., 3 F.2d 117; Read v. United States, 8 Cir., 42 F.2d 636; Van Gorder v. United States, 8 Cir., 21 F.2d·939, 942, and Stilson v. United States, 250 U.S. 583, 40 S. Ct. 28, 63 L.Ed. 1154, and other cases hereinbefore cited.

Dr. Philip Whiteley, a practicing physician and surgeon in Denver for a number of years, having testified that appellant's reputation in the community in which he lived and practiced his medical profession was good as an ethical practitioner, on cross-examination the following occurred:

"Q. Are you acquainted with a man named— A. What is his name?

"Q. Samuel Wedgle. A. Well, I may have met him at some time, but I don't recall him just now.

"Mr. Marmaduke: Will you stand up, Mr. Wedgle.

"Q. Have you even seen that man before? A. Can I ask one question about his relations? I think I can tell then possibly.

"Q. Why, sure.

"The Witness: Do you have a sister by the name of Mrs. Wine?

"Mr. Wedgle: Yes.

"A. Yes, I have met him before. I was called to treat Mrs. Wine. I delivered her baby. This is Mrs. Wine's brother, if I remember right.

"Q. Did you ever treat this man? A. He has been to my office two or three times in my recollection.

"Q. Did you ever prescribe narcotics to him? A. I did on one or two occasions, possibly three; I can't remember for sure.

"Q. Wasn't he sent as a drug addict to the penitentiary right after you prescribed for him? A. I have no information about that.

"Q. Did you ever talk to Mr. Marsh about it? A. Yes.

"Q. Did he tell you that? A. I don't recall that he ever told me. He came up after some question came up about a prescription, and he told me this man was taking morphine, or something to that effect, and after that I don't believe I ever gave the man a hypo or—

"Q. It was after he spoke to you? A. Yes, after he spoke to me. * * *

The general rule is that the accused's character witnesses may be impeached by proof of bad character for truth just like other witnesses. Madison v. State, 25 Ala. App. 50, 140 So. 623, and State v. Scott, 55 Utah 553, 188 P. 860, 866.

In the latter case, the court said: "True, the state had the right to impeach the witness by showing that his general reputation for truth and veracity was bad, or could have assailed his credibility by the usual methods."

This improper cross-examination, imputing a narcotic charge to the physician, a character witness for the defendant on trial under a similar charge, was especially objectionable, and should have been avoided by the prosecuting officer. However, no objection was made and exceptions saved.

During direct examination of the government witness, John W. Marsh, the following occurred:

"Q. Are you acquainted with a man named Tom Fina? A. I am.

"Q. Who pleaded guilty just the other day in this court? A. I am.

"Q. Are you also acquainted with a man named Pyles who also pleaded guilty in this court the other day? A. I am.

"Q. How long have you been acquainted with those two persons? A. I have known Tom Fina since 1927. I have known Buck Pyles for the past year.

"Q. State whether or not on any of these dates you have seen those two persons go into and come out of Dr. Towbin's office.

"Mr. Carr: Objected to as incompetent, irrelevant and immaterial and an unfair method of attempting to prejudice the jury with respect to matters with which this man is in no manner charged. The fact that a man who, as the attorney suggested, has gone to Leavenworth, was seen to go to the doctor's office cannot have anything to do with the matter. I will ask that the district attorney not make any more suggestions of that character.

"The Court: The jury will disregard any reference to the matter that they pleaded guilty. Otherwise the objection is overruled.

"Mr. Carr: Exception.

"The Court: Strike the question out and ask it again. The jury will disregard that question.

"Q. How long have you known these two persons, Mr. Marsh? A. I have known Tom Fina since 1927, and I have known Buck Pyles for the past year.

"Q. Are you able to state of your own knowledge whether or not at the dates mentioned in the indictment and regarding which you have just been questioned Mr. Pyles and Mr. Fina referred to were drug addicts?

"Mr. Carr: Objected to, Your Honor, for the same reason I set forth in the last objection that I made. This man is not here accused of having any contact soever with either of these men in this indictment.

"Mr. Marmaduke: He is charged with having contact with persons unknown.

"The Court: What difference does it make whether they were drug addicts? The only question is whether he sold them. Just ask him whether he dealt with these men. Don't describe them. Strike that question out, and the jury will disregard it.

"Q. State whether or not at the dates mentioned in the indictment you saw Tom Fina and Buck Pyles regarding whom you have testified go into and come out of Dr. Towbin's office.

"Mr. Carr: May I now object to it for the reason it is leading. The district attorney is not testifying.

"The Court: Q. Where did you ever see these men on or about that date? A. I saw these men on various occasions visit Dr. Towbin's office."

Proper objections were made by attorney for appellant which were sustained. No motion was made to withdraw the case from the jury on the ground that the court's ruling was not sufficient to purge the record of error, and ordinarily this error could not be taken advantage of.

In Van Gorder v. United States, supra, the late Senior Circuit Judge Walter H. Sanborn said: "But, since the decision of the Supreme Court in Wiborg v. United States, 163 U.S. 632, 659, 16 S.Ct. 1127, 1197, 41 L.Ed. 289, there has been and still exists an alleviation in the interest of justice of the strict rule and practice that no relief whatever may be granted by the federal appellate courts, except on recorded objections or exceptions to rulings in the trial courts, to the effect that in criminal cases involving the life or liberty of the accused the appellate courts of the United States may notice and correct, in the interest of a just and fair enforcement of the laws, serious errors in the trial of the accused fatal to the defendant's rights, although those errors were not challenged or reserved by objections, motions, exceptions, or assignments of error," with cited cases.

Under this record, this appears to have been prejudicial to the rights of the defendant.

The judgment of the lower court is reversed, and the case remanded.

BRATTON, Circuit Judge (concurring).

First. The evidence and its permissive inferences presented the issues whether appellant used the presence of Mrs. Hagen in his office to make a false record in her name, and in fact dispensed morphine to a person unknown; whether he dispensed

any medicine to Mrs. Smith on January first; whether on January third and fourth, he gave her tablets—not capsules—about the size of aspirins, used her presence in the office to make false records in her name, and in fact dispensed morphine in capsule form to persons unknown; or whether in the first instance he dispensed narcotics to Mrs. Whalen and through mistake inserted the name of Mrs. Hagan in the record, and in the second and third instances he actually dispensed capsules containing morphine to Mrs. Smith. The court submitted those issues to the jury and they were resolved against appellant.

Second. No objections were interposed to the questions propounded to Dr. Whiteley in the course of cross-examination; no exceptions were taken; there is no assignment of error relating to the impropriety of the questions; and the matter is not presented in the brief of appellant. It was mentioned for the first time in the course of oral argument. The general rule is that an error taking place during the trial must be appropriately called to the attention of the trial court by objection, exception, or motion; and that, in the absence of such objection, exception, or motion, it will not be reviewed on appeal even though it was prejudicial. Bogileno v. United States, 10 Cir., 38 F.2d 584; Addis v. United States, 10 Cir., 62 F.2d 329; Trefone v. United States, 10 Cir., 67 F.2d 954; Aldridge v. United States, 10 Cir., 67 F.2d 956; Hoffman v. United States, 10 Cir., 68 F.2d 101; Strader v. United States, 10 Cir., 72 F.2d 589; Kelly v. United States, 10 Cir., 76 F.2d 847; Edgmon v. United States, 10 Cir., 87 F.2d 13. The rule bears a well-recognized exception. It is that where life or liberty is involved an appellate court may notice and correct a serious error which was plainly prejudicial without it being challenged in the trial court, and even though it is not presented by assignment of error. Bogileno v. United States, supra; Reynolds v. United States, 10 Cir., 48 F.2d 762; Addis v. United States, supra; Williams v. United States, 10 Cir., 66 F. 2d 868; Strader v. United States, supra; Jaramillo v. United States, 10 Cir., 76 F.2d 700; Kelly v. United States, supra; Edgmon v. United States, supra. But it cannot be said that the eliciting of the testimony in question constituted an error of that nature.

Third. The reference made in the direct examination of the agent in the Bureau of Narcotics to the fact that the office of appellant had been under observation, the proof that Fina and Pyles had visited it, the reference to them as persons who had recently pleaded guilty, and the question whether they were known addicts, even though that question went unanswered, all considered together, were reasonably calculated to create in the minds of the jury belief that such persons had some illicit connection with appellant respecting the sale and disposition of narcotics—perhaps as purchasers of the quantities described in the indictment or as a general outlet; and bearing in mind the prejudice commonly existing against one who is known to engage in the illicit sale and dispensation of morphine, it cannot be said that the effect was harmless. On the other hand, it was prejudicial. Subtle suggestions, references, and innuendoes of a prejudicial nature which have no basis of fact are sometimes fatal to a fair trial and cannot be sanctioned. See Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Fontanello v. United States, 9 Cir., 19 F. 2d 921; Turk v. United States, 8 Cir., 20 F.2d 129. My concurrence in the reversal is confined to this ground.